# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

Filed/Docketed
Sep 18, 2015

|  |  |
|---|---|
| IN RE:<br><br>**RAHNDEE INDUSTRIAL SERVICES, INC.,**<br><br>Debtor. | **Case No. 13-11210-M**<br>**Chapter 11** |
| **RAHNDEE INDUSTRIAL SERVICES, INC.,**<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES OF AMERICA ex rel. THE INTERNAL REVENUE SERVICE and RCB BANK,**<br><br>Defendants. | **Adv. No. 13-01050-M** |

## MEMORANDUM OPINION

*"In this world nothing can be said to be certain, except death and taxes."*[1]

One could add a corollary to Dr. Franklin's words: the only thing as certain as death and taxes is most people's desire to avoid both. When it comes to taxes, an entire industry, ranging from accounting firms, to tax lawyers, to those people you see on late night television promising to smooth things over with the taxing authorities, has emerged over the years in order to minimize, compromise, or eliminate tax liability. Many creative strategies have been crafted to achieve these goals. Some are legitimate. Others are not. Every now and then, they are contested in a court of law.

---

[1] Benjamin Franklin (1706-90), in a letter to Jean-Baptiste Leroy, 1789, re-printed in *The Works of Benjamin Franklin*, 1817.

This case involves a transfer between corporations.  The first company had a significant tax debt.  The second company was brand new, created solely for the purpose of facilitating the acquisition.  The transaction was structured as an asset purchase; however, a lot of things, like the nature of the business, its day-to-day management, its telephone number, and its customers, did not change.  Other things, like its shareholder, did.  The taxing authority cries foul, and says the second corporation should be made to pay the taxes.  The second company, now a debtor in this Court, says the taxes are not its problem.  They have left the matter for this Court to decide.  The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052.

## Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), and venue is proper pursuant to 28 U.S.C. § 1409.[2]  Reference to the Court of this matter is proper pursuant to 28 U.S.C. § 157(a).  This is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(B) and (C).  This Court has jurisdiction to determine the amount or legality of the taxes and penalties at issue in this proceeding pursuant to § 505.

## Findings of Fact

Jeffery R. Reetz ("Reetz") and Joseph D. Grubb ("Grubb") have been business partners for 12 years.  Grubb has almost 30 years' experience in foundry related businesses.  Reetz has been in the foundry business for almost 44 years, and holds both MBA and J.D. degrees.  One of the

---

[2]  Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*.

businesses owned by Reetz and Grubb was Beryllium Enterprises, Inc. ("Beryllium"), where each was a 50% shareholder.  Beryllium was an Oklahoma corporation formed in 2005 that leased employees to various manufacturing companies.  A second business owned by Reetz and Grubb was Finished Castings Inc. aka FCI, Ltd. ("FCI"), where each was also a 50% shareholder.  FCI was an Oklahoma corporation involved in the processing of heavy iron and performing the finished grinding, sanding, and polishing of iron and steel castings.  Beryllium and FCI operated out of the same location in Claremore, Oklahoma, in a building owned by Reetz and Grubb.  For purposes of this litigation, the parties have agreed that Beryllium and FCI are alter egos, such that FCI may legally be held responsible for Beryllium's debts.

*The Beryllium Tax Debt*

Beryllium failed to properly pay its employment tax liabilities owed for certain quarters in 2008 and 2009 (the "Trust Fund Taxes").  This caused the IRS to assess penalties and interest in addition to the original employment tax debt (the "Tax Debt") against Beryllium.[3]  As the owners of Beryllium, Reetz and Grubb were, under U.S. tax law, personally liable for the Trust Fund Taxes. Beryllium, Reetz, and Grubb hired attorney Paul Tom ("Mr. Tom") to represent them before the IRS. Between January and October of 2011, Reetz and Grubb caused FCI to make payments of more than $59,000 to the IRS towards the Tax Debt.[4]  On August 31, 2012, Mr. Tom sent a letter to the IRS proposing a 42-month plan that would have resulted in FCI paying $10,000 per month to settle all of

---

[3]  Although the Tax Debt was originally assessed against Beryllium, RahnDee has conceded that FCI is the alter ego of Beryllium for purposes of liability for the Tax Debt.

[4]  *See* IRS Exhibit No. 107.

3

the remaining Tax Debt (the "Proposal").[5] IRS Revenue Agent Olusola Dada ("Mr. Dada") was assigned to the Beryllium tax case. As part of the Proposal, Beryllium provided financial information regarding FCI to show that FCI was able to make the proposed payments. Mr. Dada later communicated to Mr. Tom that he was not inclined to accept the Proposal, and that the IRS needed more information regarding various business expenses reported by FCI before he would accept it.

In an effort to override Mr. Dada's assessment of the Proposal, Mr. Tom requested a meeting with Mr. Dada's supervisor, Ms. Tanya Quisenberry ("Ms. Quisenberry"), to be held on September 27, 2012, to discuss the Tax Debt, the Proposal, and to address Mr. Dada's concerns regarding FCI's expenses. Reetz and Grubb were expected to attend that meeting, since 1) it was being held at their request; and 2) they were the only parties with working knowledge of FCI's operations. Mr. Tom, Mr. Dada, and Ms. Quisenberry attended the meeting; Reetz and Grubb did not.[6] Mr. Dada testified that at the September 27, 2012, meeting, he told Mr. Tom that he intended to make a recommendation to the IRS general counsel that FCI be held responsible for Beryllium's Tax Debt as its alter ego and successor in interest. Based on these facts, as well as the testimony outlined in the following paragraph, the Court finds that Mr. Tom, Reetz, and Grubb were well aware in September 2012 that the IRS planned to look to FCI for further payment of the Tax Debt.

Beryllium had no significant assets upon which the IRS could levy to recover the Tax Debt. On approximately September 14, 2012, the IRS levied on personal bank accounts of Reetz and Grubb, as parties responsible for the Trust Fund Taxes, and garnished 100% of their wages. Grubb testified

---

[5] *See* IRS Exhibit No. 191. *See also* Pre-Trial Order, *Docket No. 98*, at 8, ¶ D(1).

[6] Grubb and Reetz suggested that they were too ill to attend the September 27, 2012, meeting. Their activity level in liquidating the assets of FCI suggests otherwise.

4

that this seizure convinced him that the September 27, 2012, meeting would be futile, and that the IRS would not accept the Proposal. Instead of attending the meeting, Grubb and Reetz came up with "Plan B." Plan B was to sell FCI's assets—the only unencumbered assets under their control that had not been previously levied by the IRS—in order to pay the Trust Fund Taxes, i.e., only that portion of the Tax Debt for which Reetz and Grubb were personally liable. Reetz and Grubb emphatically deny that they were aware in September 2012 that the IRS planned to hold FCI responsible for the entire Tax Debt. The Court gives their testimony in this regard little weight.

*Plan B: The Formation of RahnDee*

Grubb testified that on the same day his personal bank accounts were seized by the IRS, he began working on Plan B, i.e., looking for a buyer for the assets of FCI to generate funds to pay off the Trust Fund Taxes. He approached a single individual, Jeffrey Losornio ("Losornio") about the deal. Losornio was a long-time family friend of Grubb, with whom Grubb had been engaged in a previous small business venture. Losornio was a local small businessman involved in screen printing and embroidery, advertising, and marketing. He had absolutely no experience in the foundry, manufacturing, iron, or steel casting businesses. What Losornio did have was good credit. Grubb offered to sell FCI's accounts receivable and equipment to Losornio for $155,000, and do it quickly. Losornio agreed without further negotiation. Losornio was fully aware that FCI, Grubb, and Reetz had "trouble" with the IRS, and that the motivation for the quick sale lie therein.

As soon as Losornio agreed to the purchase, a flurry of activity began—the entire deal was completed within five days.[7] An entity named RahnDee Industrial Services, Inc. ("RahnDee") was

---

[7] *See* Pre-Trial Order, *Docket No. 98*, at 6 ¶ C(16).

incorporated with the State of Oklahoma on September, 25, 2012, naming Losornio as the initial director.[8]  All matters relating to the incorporation were handled by Reetz, including drafting the articles of incorporation and corporate by-laws.  RahnDee adopted by-laws on September 25, 2012, signed by Grubb as President.[9]

Two separate documents were produced purporting to be the "Minutes of First Meeting of Board of Directors of RahnDee Industrial Services."[10]  They tell markedly different stories.  The first, dated September 25, 2012, names Reetz as Chairman, CEO, and Secretary; and names Grubb as President.[11]  It indicates that RahnDee would issue 50,000 shares with par value of $1 each.  Five hundred shares were issued to Losornio "upon payment to the Corporation [RahnDee] of the subscription price of $1.00 per share, for a total amount of $500.00."  These minutes were signed by Losornio as "Director."[12]  The second set of first meeting minutes is dated November 8, 2012.  This document indicates that Reetz was elected to the Board of Directors and as its Chairman, and designated as Secretary and CEO.  Grubb was also elected to the Board of Directors, and designated the Treasurer and Chief Operating Officer.  Finally, Losornio was elected to the Board of Directors.  No president was named. This document was signed by Reetz, Grubb, and Losornio.[13]

---

[8]  *See* Debtor's Exhibit No. 2.

[9]  *See* IRS Exhibit No. 139.

[10]  *See* IRS Exhibit Nos. 141 & 142.

[11]  The Court notes that the petition and schedules filed with the Court were signed by Reetz as President of RahnDee.  *See* Case No. 13-11210-M, Docket No. 1; Debtor's Exhibit No. 52.

[12]  *See* IRS Exhibit No. 141.

[13]  *See* IRS Exhibit No. 142.

Losornio never paid the $500 for the RahnDee stock, although he was issued a stock certificate for the 500 shares.[14]  The November 8, 2012, minutes authorized the directors "to issue the shares of the Corporation to the full extent authorized by the Certificate of Incorporation in such amounts and for such consideration as from time to time shall be determined by the Directors, and as may be permitted by law."[15]  As of December 3, 2014, there were 49,500 shares in RahnDee that have been issued but not yet sold or transferred by RahnDee to anyone.[16]

Grubb testified that RahnDee took possession of FCI's assets and receivables, i.e., the "deal was done," on September 23, 2012, or perhaps earlier.  Reetz has submitted inconsistent declarations to this Court regarding whether RahnDee took over operations on September 24 or September 28 of 2012.  From September 24, 2012, new accounts receivable were generated and operating expenses paid in the name of RahnDee, despite the facts that no money had changed hands, and RahnDee was not incorporated with the state until September 25, 2012.  When asked why Reetz and Grubb agreed to give away FCI's assets before receiving any compensation, Grubb stated that "they had no choice" because they "had to feed their families."  He testified that he was careful not to receive any compensation until the Trust Fund Taxes had been fully paid, lest it be levied by the IRS.  Both Reetz and Grubb made it quite clear that their plan was designed to sell FCI's assets to Losornio in order to fund a loan that would pay off the Trust Fund Taxes, which would stop the IRS from further levy of their personal assets and accounts.

_____

[14] Debtor's Exhibit No. 1.

[15] *See* IRS Exhibit No. 142.

[16] *See* Pre-Trial Order, *Docket No. 98*, at 6 ¶ C(14).

A document titled "Purchase and Sale of Business Agreement" (the "Purchase Agreement") between FCI and RahnDee was drafted by Reetz and executed by Reetz on behalf of FCI and Losornio on behalf of RahnDee on September 28, 2012.[17] Although structured as an asset sale, the Purchase Agreement contains the following condition:

> The Seller [FCI] will provide the Purchaser [RahnDee] with complete information concerning the operation of the Corporation [FCI], in order to put the Purchaser in a position to carry on in the place of the Seller.[18]

RahnDee also agreed to hire select employees of FCI, and adopt and assume all of the employee benefit plans previously provided by FCI.[19]  The Purchase Agreement defines the "Closing Date" to be September 28, 2012.  It also states that "[a]t Closing and upon the Purchaser [RahnDee] paying the Purchase Price in full to the Seller [FCI], the Seller will deliver the Assets to the Purchaser."  The Purchase Agreement describes Business Equipment valued at $80,000 and Accounts Receivable valued at $75,000, for a total purchase price of $155,000.[20]  It defines "Excluded Assets" as cash, securities, and various records.

---

[17]  *See* IRS Exhibit Nos. 144–146.  The Purchase Agreement states that it is "made and entered into this 24th day of September, 2012 (the "Execution Date")."  Reetz's and Losornio's signatures fall under the statement "IN WITNESS WHEREOF the Parties have duly affixed their signatures under hand and seal on this 28th day of September, 2012."  *See also* Pre-Trial Order, Docket No. 98, at 4 ¶ B(20).

[18]  IRS Exhibit No. 144 ¶ 23(f).

[19]  *Id.* ¶ 26, 31.

[20]  Grubb testified that FCI did not sell all of its accounts receivable to RahnDee, although the Purchase Agreement defines "All Accounts Receivable" among the assets transferred.  *See* IRS Exhibit Nos. 144–146.

In documents produced to the IRS in conjunction with this litigation, Reetz and Grubb produced a Bill of Sale, dated September 24, 2012, executed by Reetz, as CEO of FCI, which indicated that $155,000 had been paid in cash by RahnDee to FCI, "the receipt of which consideration is acknowledged," on that date in exchange for certain equipment and accounts receivable.[21]  Attached to the Bill of Sale was a list of the equipment and FCI accounts receivable as of September 24, 2012.[22] The attached list of equipment appears to be from an email sent on September 27, 2012; the list of accounts receivable was generated using Quickbooks software on October 5, 2012.  Despite Reetz's execution of the Bill of Sale, no consideration changed hands on September 24, 2012.

The next step was to acquire the funds to pay off the Trust Fund Taxes.  RahnDee sought a loan from RCB Bank ("RCB Bank"), with whom Losornio had a long banking relationship.  As part of that loan request, RahnDee submitted a copy of the Purchase Agreement to RCB Bank that included a list of both equipment and accounts receivable that were being acquired.  In addition, Grubb sent RCB Bank a list of the equipment being transferred that he valued at $195,000, which he indicated was one-half the original purchase price.[23]  The list of accounts receivable submitted to RCB Bank was described as belonging to RahnDee as of October 2, 2012, and valued at over $134,000.[24]  This included the accounts receivable purchased from FCI, valued at approximately $75,000, plus additional

---

[21]  IRS Exhibit No. 150.

[22]  *See id.* at 3–4.

[23]  *See* IRS Exhibit Nos. 152, 153.  A representative of RCB Bank indicted that he asked another bank customer who just happened to be in his office if he thought the values seemed accurate.  RCB Bank did not conduct any independent appraisal of the assets.

[24]  *See* IRS Exhibit No. 146.  A version of the same Purchase Agreement later produced to Mr. Dada included a list of accounts receivable described as belonging to FCI as of September 24, 2012, valued at just over $76,000.  *See* IRS Exhibit No. 145.

accounts receivable, valued at approximately $55,000, purportedly generated by RahnDee between September 24, 2012, and October 2, 2012. In the eyes of RCB Bank, this gave the bank approximately $329,000 in collateral to secure a $140,000 loan. Based on the list of assets and accounts, RCB Bank issued a loan to RahnDee, **not Losornio,** in the principal amount of $140,315. Losornio was required to guarantee the loan. Losornio testified that he was careful to ensure that RCB Bank conducted due diligence regarding UCC filings based on his awareness that FCI had tax issues with the IRS.[25] RCB Bank took a purchase money security interest in "all Inventory, Accounts and Equipment" of RahnDee. Losornio executed a Business Loan Agreement, Promissory Note, and Commercial Security Agreement on behalf of RahnDee, representing himself to be its "President/Secretary."[26] The loan closed and was funded on October 3, 2012.

On October 3, 2012, upon receipt of the loan proceeds from RCB Bank, RahnDee paid $140,000 to FCI. Despite the listed sales price of $155,000 in the Bill of Sale and the Purchase Agreement, no other funds were transferred from RahnDee or Losornio to FCI, Reetz, or Grubb.[27] RahnDee claims that the remaining $15,000 took the form of an "unwritten promise to pay FCI," although it was not listed as a debt in RahnDee's subsequent bankruptcy filing.[28] Losornio also testified that because of the trouble he had endured as a result of the subsequent IRS levies against RahnDee's customers and these bankruptcy proceedings, Reetz and Grubb understood that "it's

---

[25]   There is no indication that Losornio discussed FCI's tax problems with RCB Bank.

[26]   *See* RCB Bank Exhibit Nos. 201, 202, and 204.

[27]   At one time, Reetz told the IRS that FCI had received the entire $155,000 from RahnDee.  This was untrue.

[28]   *See* Pre-Trial Order, *Docket No. 98*, at 6 ¶ C(22); IRS Exhibit No. 149.

10

unrealistic to expect to get that $15,000." As of October 3, 2012, RahnDee's balance sheet reflected assets of over $330,000, including over $187,000 in Accounts Receivable and over $140,000 in "Furniture and Equipment."[29]  The balance sheet also reflected that RahnDee had total equity of $189,931.97 on October 3, 2012.[30]

In response to a request from Reetz and Grubb, by letter dated October 9, 2012, the IRS informed Reetz that the balance of the Trust Fund Taxes, as of that date, was $163,376.88.[31]  On that same date, the IRS received a $163,376.88 payment from Reetz that was designated for payment toward Beryllium's Trust Fund Taxes (the "Designated Payment").  Reetz and Grubb used the proceeds of the sale of FCI's assets to RahnDee, $140,000, to make the Designated Payment.  Grubb testified that the remaining $23,376.88 came from cash on hand at FCI, and some accounts receivable that had not been sold to RahnDee.[32]

After receiving the Designated Payment, the IRS issued Certificates of Release of Federal Tax Lien, naming Beryllium, Reetz, and Grubb as taxpayers.[33]  Reetz and Grubb intended that the Designated Payment be accepted in total satisfaction of the Tax Debt for which they could be held personally liable; i.e., the Trust Fund Taxes.  Their hope was that the remaining Tax Debt, i.e., the penalty and interest obligation, would be effectively "trapped" in FCI and Beryllium, which were to

---

[29]  *See* IRS Exhibit No. 151.

[30]  *Id.*

[31]  *See* IRS Exhibit No. 174.

[32]  This, despite the fact that the Purchase Agreement stated that all of FCI's outstanding accounts receivable were included in the sale to RahnDee.

[33]  Debtor's Exhibit Nos. 31, 50, 51.

be dissolved. The day-to-day business operations of FCI would continue in the form of RahnDee, and Reetz and Grubb would continue to draw income and benefits as they had in the past.

FCI and Beryllium had used accounting software known as "QuickBooks" to keep their financial records. Immediately before FCI transferred its assets to RahnDee, the QuickBooks electronic data files were stored on two computers, which were located in FCI's offices. Those two computers were disposed of sometime after October 3, 2012. Neither RahnDee, Reetz, nor Grubb saved a copy of the QuickBooks electronic data files of FCI or Beryllium, nor made any other effort to preserve the data in electronic form, before the computers were destroyed. Reetz testified that the data was preserved in a hard-copy paper format in order to complete FCI's final 2012 tax returns, and that he did not think it was important to preserve the data in any electronic format.

On Thursday, September 27, 2012, Reetz sent an email with the subject "NewCo" from his FCI email address to at least 4 of FCI's major customers.[34] In the body of the email, Reetz identified himself as the CEO of FCI. The email included an attachment in which Reetz stated he was the CEO of RahnDee. The attachment read as follows:

Dear valued customer

Over the past several years Finished Castings Inc. has continued to evolve through growth, added markets, services and products. We will continue to grow and evolve to meet the ever changing demands of our valued customers, in an effort to market more effectively to our customers changing needs FCI will become RahnDee Industrial Services Inc. EIN # 46-1056590. RahnDee Industrial Services Inc. will continue to give our valued customers the service, products, quality, delivery and value that you have come expect [sic]. To help us facilitate this change please be advised that all

---

[34] *See* IRS Exhibits 156–160. Representatives of American Castings, Parrish Industries (also known as Central Machine & Tool), Tonkawa Foundry, and Acme Foundry each produced copies of the email to the IRS and testified to receiving the email from Reetz.

future correspondence and remittance to invoices will be to RahnDee Industrial
services [sic] Inc. @ P.O. box 749 Claremore, Oklahoma 74018.  RahnDee Industrial
Services Inc. thanks you for your continued business and support, our hope is that this
change will strengthen and grow our respective companies business relationship.
Thank you in advance for your understanding and assistance in this matter, please feel
free to contact me with any questions or comments.

Sincerely

Jeffrey Reetz CEO

RahnDee Industrial Services Inc.[35]

FCI began dissolution proceedings in September 2012, and both FCI and Beryllium stopped doing

business in the fall of 2012.  FCI ceased operations after selling its assets to RahnDee.

The name "RahnDee Industrial Services, Inc." was suggested to Losornio by Reetz.  Reetz's

middle name is "Rahn," and Grubb's middle name is "Dee."[36]  Prior to the formation of RahnDee,

Reetz and Grubb had owned a corporation called "Rahndee Industries."  Losornio testified that the

choice of the name RahnDee was made because he thought it was important for customers to know

that Reetz and Grubb were running the business.

From its inception, Reetz and Grubb were in virtual control of every aspect of RahnDee.

RahnDee operated from the same physical location as had FCI, and utilized the same phone number,

website, etc.  RahnDee employed Reetz and Grubb to operate its business, although it had no

employment contracts or non-compete agreements with them.  Losornio testified that at the time

RahnDee acquired the assets from FCI, he knew nothing about the business of FCI.  He also testified

---

[35]  IRS Exhibit Nos. 156–160.  The Court notes that during discovery in this matter,
RahnDee denied that any correspondence had been sent to customers regarding the transition
from FCI.  These letters were obtained by the IRS directly from RahnDee's customers.

[36]  *See* Pre-Trial Order, *Docket No. 98*, at 5 ¶ C(12).

that he reviewed the "Profit and Loss" statements of RahnDee monthly, but he was wholly ignorant of the particular expenses borne by RahnDee on behalf of Reetz and Grubb when questioned at trial. Losornio did not begin reviewing RahnDee's financials until 5-6 months into its operation.  This coincided with the time when the IRS began its effort to collect the Tax Debt from RahnDee.

At the time of the bankruptcy filing, Reetz and Grubb were each drawing salaries of $180,000 per year.  As additional compensation, RahnDee provided personal vehicles and health insurance for Reetz and Grubb.[37]  It also paid personal legal expenses of Reetz, including attorney's fees of both he and his wife related to their divorce and attorney's fees related to the Tax Debt.[38]  Losornio testified that RahnDee was obligated to make such payments through a provision in the Purchase Agreement, although he could not point to any specific provision regarding those payments.  Reetz testified that Losornio had agreed to pay all Reetz's legal and professional expenses.

Between October 2012 and April 2014, Losornio did not receive any property on account of his ownership interest in RahnDee, such as dividends or salary.  RahnDee gained equity in the equipment and accounts receivable as it paid off the RCB Bank loan.  Losornio described receiving two "loans" of approximately $2,000 each to another company he owned, although those were booked as expenses by RahnDee.[39]  Only in April or May 2014, after the IRS began to pursue RahnDee for

---

[37]  *See* IRS Exhibit No. 163 (RahnDee Disclosure Statement dated June 24, 2013), at 5 ¶II(B).  Grubb and Losornio testified that RahnDee did not provide an automobile for Reetz, but instead compensated him for travel related expenses.

[38]   These payments were made to the law firms of Lyons & Clark; Smakal Munn & Mathis; and Morrel Hicks Barnhart.  In fact, at least some of these personal legal expenses paid on Reetz's behalf were deducted by RahnDee as legal expenses on its 2012 tax return.

[39]  IRS Exhibit No. 164, at 13.

payment of the Tax Debt, did Losornio begin taking $1000 per week as "compensation" from
RahnDee.

In addition to their salary and benefits, RahnDee made rent payments of $10,000 per month
to Reetz and Grubb, as owners of the building where it operated.[40]  Grubb testified that the mortgage
holder on the building required payments of $10,000 per month, based on the settlement of a prior
foreclosure action.  Losornio claims to have had a verbal agreement with Reetz and Grubb that of the
$10,000 rent payment, $4,000 went towards payment of the note on the building, and $6,000 went
towards his equity when, and if, RahnDee ever purchased the building (the "Option Agreement").  The
Option Agreement was not disclosed in RahnDee's bankruptcy schedules.  The Option Agreement was
not reduced to writing until well after this bankruptcy case was filed, and this litigation was pending.

In May 2013, the IRS filed a Notice of Tax Lien against RahnDee, as the alter ego and/or
successor in interest of Beryllium, asserting a claim of $241,603.81 (the "Tax Lien").  The IRS served
Notices of Levy on several customers of RahnDee and a bank account of RahnDee (the "Levies").[41]
As a result of the Levies, the IRS obtained at least $74,903.63 and applied the same to the Tax Debt.

---

[40]  Reetz and Grubb had charged FCI $5,000 per month for a month-to-month lease on the
same building.  Although RahnDee's lease term commenced on October 1, 2012, the lease
agreement between RahnDee and Reetz and Grubb, dated September 30, 2012, stated that
RahnDee was entitled to possession of the premises as of September 1, 2012.  *See* IRS Exhibit
No. 167, at 3 ¶ 8–9.

[41]  A lien secures the government's interest in property when a taxpayer does not pay its
tax debt.  A levy actually takes the property to pay the tax debt. If a taxpayer does not pay or
make arrangements to settle its tax debt, the IRS can levy, seize and sell any type of real or
personal property that the taxpayer has an interest in, including accounts receivable owed to the
taxpayer by third parties.  *See* http://www.irs.gov/Businesses/Small-Businesses-&-Self-
Employed/Understanding-a-Federal-Tax-Lien.

As of the date of RahnDee's petition, the balance of the Tax Debt, including penalties and interest, was $160,429.81. The Levies prompted this bankruptcy filing.

The corporate governance of RahnDee remained in the hands of Reetz and Grubb for quite some time, and with apparent good reason. In April 2014, Losornio was wholly ignorant of basic facts regarding RahnDee's corporate structure, including whether it had a board of directors, the identity of those directors, or what positions Reetz or Grubb held with the company. He did not know whether RahnDee provided health or disability insurance benefits to its employees. Nor could he identify any of RahnDee's top three customers. At that time, Losornio incorrectly believed that he was RahnDee's Chairman and President, although according to the minutes of the board of directors meeting dated September 25, 2012, those positions were held by Reetz and Grubb, respectively. According to the Disclosure Statement dated June 24, 2013, filed in RahnDee's bankruptcy case, Reetz was and would continue as RahnDee's President.[42] Minutes of meetings of the board of directors, dated both July 26, 2013, and September 6, 2013, represented that Losornio was Chairman of the Board of Directors, and were signed by Reetz as President and Grubb as Secretary.[43] In June 2013, Losornio signed a letter to the IRS in which he represented himself as the Chairman of the Board of Directors of RahnDee. In April 2014, Losornio testified before this Court that he was Chairman and an officer of RahnDee. The Pre-Trial Order filed in this litigation names Grubb as Chief Operating Officer, President, Treasurer, and board member. It lists Reetz as CEO and Secretary.[44] Losornio blamed the disrespect of corporate formalities on the fact that he was "not detail oriented." He insisted that board meetings

___

[42] IRS Exhibit No. 163.

[43] Debtor's Exhibit Nos. 8, 9.

[44] *See* Pre-Trial Order, *Docket No. 98*, at 5 ¶ C(7–8).

16

were actually held, although he could not describe when, where, or how any meeting was conducted. Although Losornio admits to being heavily dependent on Reetz and Grubb for advice and guidance regarding all aspects of the business, Losornio is adamant that he "controls" RahnDee.

Losornio makes much of the fact that since February 2015, both Reetz and Grubb have been removed from the board of directors and stripped of their role as officers of RahnDee. Reetz is currently employed as a personal consultant to Losornio regarding both RahnDee and Losornio's other business interests. Grubb continues as general manager of RahnDee. Grubb testified that FCI was not profitable in the two years prior to the sale of the FCI assets to RahnDee, describing them as the "worst years ever." Yet since its formation, RahnDee has been solvent, and in fact profitable, but for the expenses related to the Levies and these bankruptcy proceedings.[45]

*The RahnDee Bankruptcy Case*

RahnDee filed an original petition for relief under Chapter 11 of the United States Bankruptcy Code with this Court on May 20, 2013. A plan was confirmed in this case on September 3, 2013, with the understanding that the matters involved herein were yet to be resolved. The IRS filed a proof of claim for $166,700.18, alleging that the Tax Debt is owed by RahnDee, on the basis that RahnDee is either the alter ego of or successor in interest to Beryllium/FCI (the "IRS Claim").[46]

---

[45] Losornio admitted that RahnDee has already spent more in legal fees related to the bankruptcy and this adversary proceeding than if it had just paid the Tax Debt from the beginning.

[46] Case No. 13-11210-M, Claim No. 1-3.

*The Adversary Proceeding*

RahnDee filed this adversary proceeding (the "Adversary Proceeding") against the IRS on July 10, 2013.  The Adversary Proceeding contains five separate claims for relief:

1.  An objection to the IRS Claim on the basis that the Tax Debt is owed by FCI/Beryllium, not RahnDee;

2.  A request that, if any portion of the IRS Claim is allowed, it be allowed as a secured claim junior and inferior to the secured claim of RCB Bank;

3.  A request to abate that portion of the IRS Claim that constitutes penalties and interest, rather than actual taxes owed;

4.  A claim that the Levies against RahnDee and its customers were improper because RahnDee does not owe any of the Tax Debt; and

5.  A claim that, in the event the IRS Claim is disallowed, all tax liens filed by the IRS be avoided as fraudulent transfers.[47]

The IRS filed its answer to the Complaint on August 26, 2013.[48]  On September 19, 2013, RCB Bank sought permission to intervene in the Adversary Proceeding, claiming that its lien upon the assets of RahnDee was superior to any lien that might be held by the IRS.[49]  The Court granted the motion to intervene, and RCB Bank filed its answer and cross-claim on October 4, 2013.[50]

The Adversary Proceeding has been vigorously contested.  There have been discovery disputes, motions for summary judgment, numerous requests for extensions of time, and disputes over the scope of matters to be tried.  In an effort to streamline resolution of the dispute between RahnDee and the IRS, this Court entered the following text order on September 5, 2014:

---

[47] *Docket No. 1.*

[48] *Docket No. 8.*

[49] *Docket No. 10.*

[50] *Docket No. 12.*

Order Denying Motion For Summary Judgment (Related Doc # 46). THIS MATTER comes before the Court pursuant to the Motion of the United States of America, Defendant, for Partial Summary Judgment (the "IRS Motion") filed at Docket No. 46. The Court has thoroughly reviewed the pleadings and papers filed in support and in opposition of the IRS Motion. After completing its review, the Court finds that a genuine issue of material fact exists with respect to Count One of Plaintiff's Complaint as sought in the IRS Motion, and that summary judgment as to Count One is not appropriate. With respect to the claim that summary judgment is appropriate as to Count Three of Plaintiff's Complaint, the Court finds that consideration of the issue is premature. Unless and until it is determined that Plaintiff is liable to the Defendant as the successor-in-interest to or alter ego of Beryllium Enterprises, Inc. and/or Finished Castings, Inc. ("FCI"), there is no need for the Court to consider the issue of penalty abatement. Accordingly, IT IS HEREBY ORDERED that the Motion of the United States of America, Defendant, for Partial Summary Judgment filed at Docket No. 46 be, and the same hereby is, denied to the extent it seeks summary judgment as to Count One of the Complaint filed herein. IT IS FURTHER ORDERED that consideration of the IRS Motion as it relates to Count Three is suspended until after the Court issues its ruling on the issues of whether that Plaintiff is liable to the Defendant as the successor-in-interest to or alter ego of Beryllium Enterprises, Inc. and/or FCI. The issues of successor-in-interest and alter ego shall be tried prior to consideration of any other claims in this adversary proceeding. The parties are authorized to limit the pre-trial order in this case to those issues, with the understanding that any remaining issues shall be resolved, if necessary, after the issues of successor-in-interest and alter ego have been resolved.  BY THE COURT: Chief Judge Terrence L. Michael. (text-only order) This entry is the Official Order of the Court. No document is attached.[51]

In accordance with the terms of this order, trial on the alter ego and successor liability issues commenced on April 14, 2015, and lasted four days.  At trial 1) RahnDee conceded that FCI was the alter ego of Beryllium for purposes of the Adversary Proceeding, and 2) the IRS conceded that the lien of RCB Bank on the assets of RahnDee was superior to the lien claimed by the IRS.  Upon the conclusion of the trial, the parties were given the opportunity to submit post-trial briefs, the last of which was received by the Court on June 12, 2015.

---

[51] *Docket No. 91.*

To the extent the "Conclusions of Law" contains items that should more appropriately be considered "Findings of Fact," those findings of fact are incorporated into the Court's findings of fact by this reference.

### Burden of Proof

The IRS and RahnDee disagree on the posture of this case, and dispute which party bears the ultimate burden to persuade the Court. RahnDee asserts that this adversary is based on run-of-the-mill claims litigation, wherein a debtor presents a substantive objection to a validly filed claim, and the creditor bears the ultimate burden of persuasion as to the validity and amount of the claim.[52] The IRS asserts that, at its heart, this is an action for wrongful lien that would have been litigated outside of the bankruptcy forum—but for the filing of the bankruptcy case. It asserts that in such a case, the lien recipient, and not the government, would have the burden to show that the taxes were wrongfully applied to it.[53] The IRS argues the litigation of the validity and amount of its claim in the bankruptcy

---

[52] §§ 501(a), 502(b). *See also, e.g., In re Harrison*, 987 F.2d 677, 680 (10th Cir. 1993).

[53] *See Today's Child Learning Center, Inc.*, 40 F. Supp. 2d 268, 272 n.2 (E.D. Pa. 1998) ("The Court notes that the burden of proof in a wrongful levy action is on the plaintiff."); *Heilig-Meyers Co. v. United States (In re Heilig-Meyers Co.)*, 316 B.R. 866, 869–70 (Bankr. E.D. Va. 2004) ("In a federal tax controversy, the Commissioner of the Internal Revenue Service has the presumption of correctness. The taxpayer bears the 'risk of non persuasion,' and bears 'the burden of proving the Government's assessment wrong by a preponderance of the evidence.'") (internal citations omitted), *aff'd*, 2005 WL 1303351 (E.D. Va. 2005), *aff'd*, 232 Fed. Appx. 240 (4th Cir. 2007).

20

forum does not affect that burden.  RahnDee counters that its claim of wrongful lien is separate and apart from the claims objection process, and therefore all persuasive burdens remain with the IRS in this adversary proceeding.[54]

RahnDee's fallacy is assuming that the IRS is treated like a typical claimant in the claims litigation process.  In some ways, of course, it is.  Like all creditors, a claim must be filed on its behalf in order to participate in the distribution of estate assets,[55] and in the absence of a valid objection, its claim will be deemed allowed.[56]  In addition, a proof of claim that is executed and filed in accordance with the provisions of Rule 3001 constitutes prima facie evidence of the validity and amount of the claim.[57]  This Court agrees with RahnDee that *in the general case*, "[i]f objection is made to the proof of claim, the creditor has the ultimate burden of persuasion as to the validity and amount of the claim."[58]  This is because *in the general case*, a creditor outside of bankruptcy would have the burden to persuade the court that a debtor was liable on a particular claim.  But a claim by the IRS does not represent the general case.  The burden of proof is a substantive element of the IRS's claim.[59]  The

---

[54]  *See Post-Trial Rebuttal Brief of Plaintiff RahnDee Industrial Services, Inc.*, at Docket No. 116, at 4.

[55]  § 501.  *See also In re Tuttle*, 291 F.3d 1238, 1240 (10th Cir. 2002) ("Like other creditors, the IRS has the right to file a claim in a Chapter 11 bankruptcy proceeding to seek repayment of unpaid taxes.").

[56]  § 502(a).

[57]  Rule 3001(f).  *See In re Kirkland*, 572 F.3d 838, 840 (10th Cir. 2009); *In re Broadband Wireless Int'l Corp.*, 295 B.R. 140, 145 (10th Cir. BAP 2003).

[58]  *In re Harrison*, 987 F.2d at 680.

[59]  *Raleigh v. Ill. Dept. of Rev.*, 530 U.S. 15, 20–21 (2000).

litigation of its claim in a bankruptcy forum does not change that result.[60]

The IRS's fallacy lies in the assumption that since RahnDee would bear the ultimate burden of persuasion in a wrongful lien case, that it must bear all burdens along the way.[61]  Not so.  After RahnDee proves its standing to bring this action—a matter that is not contested—the burden of production is then placed on the IRS to prove a nexus between RahnDee and Beryllium/FCI.[62]  That nexus, whether under a theory of alter ego or successor liability, must be proven by substantial evidence.[63]  To the extent either of those theories involves the issue of fraud, the IRS must carry its burden by clear and convincing evidence.[64]  Only after the IRS proves a sufficient nexus between

---

[60]  *Id.* at 26 (". . . the burden of proof on a tax claim in bankruptcy remains where the substantive tax law put it.").

[61]  The IRS insists that "the burden of proof in a wrongful levy action is on the plaintiff," quoting *Today's Child Learning Center, Inc.*, 40 F. Supp. 2d 268, 272 n.2 (E.D. Pa. 1998).  This is technically true regarding the ultimate burden of proof, but it does not tell the whole story.  *Today's Child* cites *Century Hotels v. United States*, 952 F.2d 107, 109 (5th Cir. 1992), which gives a more complete statement of the shifting burdens involved in a wrongful levy action when it involves a successor in interest to a liable taxpayer.

[62]  *See Century Hotels v. United States*, 952 F.2d 107, 109 (5th Cir. 1992).  *Century Hotels* outlined additional burdens when a party sought to recover property taken by levy.  *See also e.g., Rivera v. United States*, 835 F. Supp. 632, 634 (S.D. Fla. 1992) ("In a wrongful levy action, the initial burden is on the Plaintiff to establish that she had title or ownership of the property levied against. After such a showing, 'the burden of proving the connection between the taxpayer and the property at issue is on the government.'") (citation omitted), *reh'g granted on other grounds*, 1993 WL 559785 (S.D. Fla. Oct. 22, 1993).

[63]  *Century Hotels*, 952 F.2d at 109; *Rivera*, 835 F. Supp. at 634.  *See also Gilbert v. Security Fin. Corp. of Okla., Inc.*, 152 P.3d 165, 174 (Okla. 2006) ("A plaintiff must overcome by "clear evidence" the presumption that a parent and subsidiary are separate and distinct entities.").  This rule is rooted in the fact that under corporate law, "corporations are distinct legal entities, and generally one corporation will not be held responsible for the acts of another." *Id.* at 175.

[64]  Tax Court R. 142(b) ("Fraud: In any case involving the issue of fraud with intent to evade tax, the burden of proof in respect of that issue is on the respondent [the IRS], and that

RahnDee and FCI, will the ultimate burden of persuasion shift to RahnDee to prove that the issuance of the Tax Lien was wrongful. [65]

*Choice of Law*

The parties also disagree over what law, state or federal, should be applied to the theories of liability proposed by the IRS.  The IRS urges the application of federal law, while RahnDee insists that state law must be applied.  On this, the Court agrees with RahnDee.  Although not universal, most courts, including those in the Tenth Circuit, have applied state law when considering issues of whether

---

burden of proof is to be carried by clear and convincing evidence. See Code sec. 7454(a).").  *See also State v. Mobley*, 1925 OK 831, 112 Okla. 152, 241 P. 155, 157 ("In an action to set aside a conveyance as in fraud of creditors, the fraud must be clearly and satisfactorily proven, and will not be implied from doubtful circumstances which only awaken suspicion.").

[65] *Century Hotels*, 952 F.2d at 109.  Once fraud is found, "strong and clear evidence on the part of the upholder of the transaction will be required to repel the conclusion of fraud." *See Payne v. Gilmore*, 382 P.2d 140, 143 (Okla. 1963).  The IRS argues that in a non-bankruptcy forum, the assessment of the tax is conclusively presumed to be valid, and that RahnDee, as a petitioner, shall bear the burden of proof of its non-liability.  The Court agrees that tax deficiency determinations of the IRS are subject to a rebuttable presumption of correctness.  *See, e.g., McCabe Packing Co. v. U.S.*, 809 F. Supp. 614 (C.D. Ill. 1992).  That means that with respect to the IRS's assessment of tax deficiency against Beryllium/FCI, RahnDee, as petitioner, bears the burden to show that determination was incorrect.  But the Court does not agree that the "presumption of correctness" extends to all actions taken by the IRS.  *See, e.g., Gromacki v. C.I.R.*, 361 F.2d 727, 730 (7th Cir. 1966) ("The presumption of correctness attributed to the Commissioner's deficiency determinations does not apply to the findings of fraud."). As the court in *Century Hotels v. United States* made clear, the burden to show the nexus between RahnDee and Beryllium/FCI lies squarely with the IRS.  *Century Hotels,* 952 F.2d at 109.  *See also Morris v. U.S.*, 813 F.2d 343, 345 (11th Cir. 1987) ("the burden of proving the connection between the taxpayer and the property at issue is on the government."); *Valley Fin., Inc. v. United States*, 629 F.2d 162, 171 (D.C. Cir. 1980) ("At the post-levy proceeding, the Service must justify its extraordinary action in connecting a third party's property to the particular delinquent taxpayer."). This includes the IRS theories of liability based on alter ego and/or successor in interest.

an entity is liable for the actions of its predecessor.[66]   Courts have noted that in the absence of "a significant conflict between some federal policy or interest and the use of state law," courts should look to state law.[67]   The United States Tax Court recently addressed this issue specifically in the context of a tax collection case and determined that there was no significant conflict between a federal policy or interest and the use of state law that would justify the adoption of federal common law in the context of successor liability.[68]   The Court agrees with this analysis, and determines that Oklahoma law should be applied to the IRS theories regarding RahnDee's liability for the Tax Debt.

### Conclusions of Law

*RahnDee's Objection to the IRS Claim*[69]

The IRS filed a claim pursuant to § 501(a) based on the Beryllium/FCI Tax Debt.[70]   Upon objection by RahnDee, this Court is tasked with determining the amount of the claim and allowing the

---

[66]   *Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1132 n.4 (10th Cir. 1991) ("A corporation's contacts with a forum may be imputed to its successor if forum law would hold the successor liable for the actions of its predecessor.")

[67]   *TFT Galveston Portfolio, Ltd. v. C.I.R.*, 144 T.C. No. 7, at *8 (2015) (*quoting Atherton v. FDIC*, 519 U.S. 213, 218 (1997)).  *See also United States v. Davis*, 261 F.3d 1 (1st Cir. 2001) ("In general, before creating a federal rule courts must consider whether federal interests require a nationally uniform body of law, whether applying state law would frustrate or conflict with a specific federal objective, and the extent to which a federal rule would disrupt commercial relationships predicated on state law.") (citing *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728– 29 (1979)).

[68]   *TFT Galveston Portfolio, Ltd. v. C.I.R.*, 144 T.C. No. 7, at *8.

[69]   For simplicity, the following discussion will focus on the claims dispute and whether RahnDee should be held liable for the Tax Debt, with the understanding that the result will also apply to the Levies.

[70]   *See* Case No. 13-11210-M, Claim No. 1-3.

claim in that amount, except where the claim is unenforceable against the debtor and property of the debtor under applicable law.[71]   Section 505(a) gives the Court authority to determine the amount or legality of taxes and penalties related to those taxes. The IRS Claim constitutes prima facie evidence of the validity and amount of the Tax Debt.[72]   The substance of RahnDee's objection is that the imposition of a tax lien against RahnDee for payment of the Tax Debt was wrongful.  RahnDee bears the ultimate burden of persuasion on this issue, just as it would in a non-bankruptcy forum.[73]   The parties do not dispute RahnDee's standing in this litigation.  Although RahnDee bears the ultimate burden on the issue of whether the Tax Lien was wrongful, the IRS must first prove, by substantial evidence, a sufficient nexus between RahnDee and Beryllium/FCI, such that RahnDee should be held liable for the Tax Debt.  The IRS presses two theories of liability: 1) that RahnDee is responsible as the alter ego of Beryllium/FCI; or 2) that RahnDee is liable as the successor-in-interest of Beryllium/FCI based on RahnDee's acquisition of the equipment and accounts receivable of FCI.  If the IRS meets this burden, RahnDee will bear the ultimate burden to show that the Tax Lien is otherwise wrongful.

*Alter Ego Theory*

"Corporations are distinct legal entities, and generally one corporation will not be held responsible for the acts of another."[74]  But this rule is not inviolable.  "In accord with the general rule,

---

[71]  § 502(b)(1).

[72]  Fed. R. Bankr. P. 3001(f).

[73]  *See supra* text accompanying note 61.

[74]  *Gilbert v. Sec. Fin. Corp. of Okla., Inc.*, 152 P.3d 165, 175 (Okla. 2006).

25

Oklahoma permits the court to disregard the corporate entity if used, (1) to defeat public convenience, (2) justify wrong, (3) to perpetrate fraud whether actual or implied, or (4) to defend crime."[75]  "One corporation may be held liable for the acts of another under the theory of alter-ego liability if (1) the separate existence is a design or scheme to perpetuate a fraud, or (2) one corporation is merely an instrumentality or agent of the other."[76]  "In other words," as one court put it, "it must appear that one corporation is merely a dummy or sham. In such cases the distinct corporate entity will be disregarded and the two corporations will be treated as one."[77]  The purpose of this exception as been stated as follows:

> There is a wealth of judicial authority establishing the principle that in a proper case the court will brush aside the corporate veil and disregard the fiction of separate corporate legal entity in order to hold one corporation responsible for the obligations of another corporation which in technical form appears to be a separate entity.  In so doing, the courts do not regard as important the fact that both corporations have been organized as separate and distinct entities in compliance with the laws regulating incorporation.[78]

In cases applying Oklahoma law, the rule is universally stated in the disjunctive, requiring *either* a showing of fraud *or* that one corporation is merely the instrumentality or agent of another.[79]  Courts

---

[75]  *Warner v. Hillcrest Med. Ctr.*, 914 P.2d 1060, 1067 n.5 (Okla. Civ. App. 1995) (*citing Robertson v. Roy L. Morgan Prod. Co.*, 411 F.2d 1041, 1043 (10th Cir. 1969); *Matter of Estate of Rahill*, 827 P.2d 896 (Okla. Ct. App. 1991)).

[76]  *Gilbert*, 152 P.3d at 175.  *See also Gulf Oil Corp. v. Oklahoma*, 360 P.2d 933, 936 (Okla. 1961) (citations omitted); *Pennmark Res. Co. v. Oklahoma Corp. Comm'n*, 6 P.3d 1076, 1081(Okla. Civ. App. 2000) (*citing Frazier v. Bryan Memorial Hospital Authority*, 775 P.2d 281 (Okla. 1989)).

[77]  *Wallace v. Tulsa Yellow Cab Taxi & Baggage Co.*, 61 P.2d 645, 648 (Okla. 1936).  *See also Gulf Oil Corp.*, 360 P.2d at 936.

[78]  *Wallace*, 61 P.2d at 647–48.

[79]  *Canal Ins. Co. v. Montello, Inc.*, 822 F. Supp. 2d 1177, 1182 (N.D. Okla. 2011).

26

note that *control* following a transfer is an essential factor in the determination of whether one entity should be held to be the alter ego of another.[80]

Reported cases have often addressed whether a parent corporation would be held liable for a debt or action of a subsidiary,[81] or whether a parent corporation could enforce a claim in the liquidation of its subsidiary.[82]  In this context, courts developed and adopted the "instrumentality rule" specifically to address when a parent-subsidiary or dominant-subservient corporate relationship is being used to facilitate a wrong.  Under this rule,

> When one corporation is but an instrumentality or adjunct of another by which it is dominated and controlled, a court may look beyond the form to the substance of the situation, and disregard the theory of distinct legal entity, for the purpose of holding the dominant corporation responsible for the liabilities of the sham corporation.[83]

About the rule, the Supreme Court of the United States had this to say:

> Petitioners invoke the so-called instrumentality rule . . . .The rule was much discussed in the opinion below. *It is not, properly speaking, a rule, but a convenient way of designating the application, in particular circumstances, of the broader equitable principle that the doctrine of corporate entity, recognized generally and for most*

---

[80]  *Frazier v. Bryan Mem'l Hosp. Auth.*, 775 P.2d 281, 288 (Okla. 1989).  *See also Gilbert*, 152 P.3d at 175.

[81]  *See, e.g., Oliver v. Farmers Ins. Group of Cos.*, 941 P.2d 985 (Okla. 1997); *Frazier*, 775 P.2d at 281.

[82]  *See, e.g., Taylor v. Standard Gas & Elec. Co.*, 306 U.S. 307 (1939).

[83]  *Frazier*, 775 P.2d at 288 n.34 (*quoting Wallace*, 61 P.2d at 645 (court's syllabus ¶ 1)).  *See also Fish v. East*, 114 F.2d 177, 191 (10th Cir. 1940) ("Corporate entity may be disregarded where not to do so will defeat public convenience, justify wrong or protect fraud.") (*citing Taylor v. Standard Gas & Elec. Co.*, 306 U.S. 307 (1939)).

*purposes, will not be regarded when so to do would work fraud or injustice.* This principle has been applied in appropriate circumstances to give minority stockholders redress against wrongful injury to their interests by a majority stockholder.[84]

Whether a court will disregard a corporate entity and find it to be an instrumentality or agent of another is an issue of fact.[85]

What is often missing from the reported cases is how courts should apply an alter ego theory to hold one corporation liable for the debts or acts of another in the absence of a parent-subsidiary or dominant-subservient relationship, i.e., how to apply the "fraud-scheme prong" of the alter ego test. RahnDee argues that, under Oklahoma law, the Court must apply a set of factors set forth in *Frazier v. Bryan Memorial Hospital Authority*[86] to determine whether one corporation should be held to be the alter ego of another.[87]   The IRS argues that application of this test is limited to the "instrumentality" prong of the alter ego test, but need not be met in the application of the fraud-scheme prong.[88]

According to *Frazier*,

---

[84]   *E.g., Taylor v. Standard Gas & Elec. Co.*, 306 U.S. 307 (1939) (emphasis added) (approving use of rule, but reaching opposite conclusion upon application), *rev'g* 96 F.2d 693, 707 (10th Cir. 1938) ("Standard and Deep Rock are separate corporate entities, but it is well settled that the fiction of corporate entity should be disregarded when it is necessary to circumvent fraud or uproot a harbor for wrong.") (Bratton, J., dissenting).

[85]   *See Edgar v. Fred Jones Lincoln Mercury of Oklahoma City, Inc.*, 524 F.2d 162, 166 (10th Cir. 1975); *Frazier*, 775 P.2d at 288 ("Whether this theory of vicarious liability be based on the principles of agency or on the doctrine of 'piercing the corporate veil,' it doubtless gives rise to a fact question.").

[86]   775 P.2d 281, 288 (Okla. 1989).

[87]   *See, e.g.,* Trial Brief of Plaintiff RahnDee Industrial Services, Inc., *Docket No. 103* at 14.

[88]   United States' Reply to RahnDee's Post-trial Brief, *Docket No. 115* at 23–24.

Factors which may be considered at trial include whether 1) the parent corporation owns all or most of the subsidiary's stock, 2) the corporations have common directors or officers, 3) the parent provides financing to its subsidiary, 4) the dominant corporation subscribes to all the other's stock, 5) the subordinate corporation is grossly undercapitalized, 6) the parent pays the salaries, expenses or losses of the subsidiary, 7) almost all of the subsidiary's business is with the parent or the assets of the former were conveyed from the latter, 8) the parent refers to its subsidiary as a division or department, 9) the subsidiary's officers or directors follow directions from the parent corporation and 10) legal formalities for keeping the entities separate and independent are observed").[89]

*Frazier*'s multi-factor test had its origins in the parent-subsidiary context,[90] and does not necessarily address whether the "separate existence" of two corporations "is a design or scheme to perpetuate a fraud." Despite this, Oklahoma courts almost universally apply some form of the *Frazier* factors when considering whether one corporation should be held to be the alter ego of another, even while acknowledging a two-prong statement of the law.[91] Again, these cases invariably involved parent and subsidiary corporations.

The problem with applying the *Frazier* factors in this case lies in the difference between the facts in this case and the facts in *Frazier* and its progeny. In *Frazier*, there was an active functioning parent corporation and an active functioning subsidiary corporation. Most of the *Frazier* factors assume that both entities are alive and well. Put another way, when Superman steps out of the phone booth, Clark Kent is still alive. Not so here. FCI has given up its business and, at least arguably, RahnDee has taken it over. FCI has been consigned to the corporate scrapheap. FCI is bereft of any

---

[89] 775 P.2d at 288.

[90] *See Taylor*, 96 F.2d at 707 (in depth discussion of the instrumentality rule) (*citing* Frederick J. Powell, Powell on Parent and Subsidiary Corporations § 5–6 (1931)).

[91] *See, e.g., Canal Ins. Co*., 822 F. Supp. 2d at 1182; *Gilbert*, 152 P.3d at 175; *Oliver*, 941 P.2d at 987. The parties cited no cases under Oklahoma law that separately applied the "fraud scheme" prong of the alter ego test.

activity.  Tests that make sense when there is are parent and subsidiary corporations (such as stock ownership, common directors, financing by the parent, and control of the subsidiary by the parent) make no sense when one of the corporations is dead.   The question before the Court is not whether a tabulation of the *Frazier* factors weighs in favor of a conclusion that RahnDee is the alter ego of FCI, but rather, whether the formation of RahnDee is "part of a design or scheme to perpetuate a fraud."

In order to answer that question, one must take a close look at the facts of this case.  Beryllium was saddled with the Tax Debt.[92]  The Tax Debt was large enough to threaten the continued existence and operation of both Beryllium and FCI.  In addition, Reetz and Grubb were personally liable for a significant portion of the Tax Debt; i.e., the Trust Fund Taxes.   Negotiations with the IRS were going nowhere.  In response, Reetz and Grubb devised "Plan B," wherein RahnDee was formed for the sole purpose of purchasing the assets of FCI for enough money to pay off the Trust Fund Taxes.  The plan was to trap the remaining liability for the Tax Debt in FCI and Beryllium.  RahnDee would continue the operations of FCI, with the same assets, address, phone number, management, and customers.  Indeed, Reetz went so far as to tell FCI's customers that "in an effort to market more effectively to our customers [sic] changing needs FCI **will become** RahnDee Industrial Services, Inc."[93]  Reetz and Grubb remained firmly in control of the operation, running RahnDee every bit as much as they ran FCI.  They effectively enjoyed all of the economic benefits of the ownership of RahnDee, while leaving Losornio with only the downside risk.  Reetz and Grubb were RahnDee's officers and the majority of its directors, and put themselves in position to acquire the majority of its stock should they

---

[92]   Remember, the parties have stipulated that FCI and Beryllium are alter egos for purposes of this litigation.  For all practical purposes, the Tax Debt belonged to FCI.

[93]   IRS Exhibit Nos. 156–160 (emphasis added).

so desire.  Reetz went so far as to bill RahnDee for his personal legal fees, including those incurred in his divorce.

The only new face in the mix was Losornio—but to describe Losornio as "in the mix" is charitable.  He ostensibly purchased his stock in RahnDee for $500, a very modest price that was, in fact, never paid.  In exchange for this, Losornio ostensibly received the ownership interest in a company with total equity in excess of $189,000,[94] that generated enough revenue to pay Reetz and Grubb all of their salary and benefits and still operate at break even or better.  Losornio knew nothing of the business and stayed out of it until the IRS came calling.  Even then he knew very little about the business, and only appeared to actively involve himself in any aspect of RahnDee's management *after* this litigation commenced.  The Court concludes that the IRS has shown by clear and convincing evidence that RahnDee was formed for the sole purpose of providing a mechanism whereby Reetz and Grubb could see their personal tax liability satisfied, trap the remaining balance of the Tax Debt in two dead corporations and continue the business operations of FCI for their own personal benefit.  Such an artifice constitutes fraud in fact.  RahnDee is liable for the Tax Debt.

*Successor-in-Interest Theory*

The issue here is whether a new corporate entity (RahnDee), under a theory of successor liability, is liable for the debts and liabilities of an old corporate entity (FCI), from which the new entity purchased assets.[95]  In *Pulis v. U.S. Electric Tool Co.*, the Supreme Court of Oklahoma stated the law as:

---

[94]  IRS Exhibit No. 151.

[95]  *See Pulis v. U.S. Elec. Tool Co.*, 561 P.2d 68, 69 (Okla. 1977).

31

The general rule, which is well settled, is that where one company sells or otherwise transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor. Exceptions to the rule are: (1) Where there is an agreement to assume such debts or liabilities (2) Where the circumstances surrounding the transaction warrant a finding that there was a consolidation or merger of the corporations, or (3) that the transaction was fraudulent in fact or (4) that the purchasing corporation was a mere continuation of the selling company.[96]

The IRS argues that the third and fourth exceptions apply to the sale of assets from FCI to RahnDee. The sale or transfer of all, or substantially all, of the assets of a corporation is a prerequisite for the imposition of successor liability against the new corporation.[97]   The Supreme Court of Oklahoma has described the purpose of the exceptions to the general rule of non-liability as follows:

Can parties managing a corporation contract debts and obligations in its name, then by some legerdemain of high financing denude the corporation of all its property and assets by transferring them to a new corporation which the same parties manage, and thereby render it powerless to pay under the mere guise of a sale? Under such circumstances, A. controlled the corporation, the corporation owed the debt; but by the transfer A. still controls the corporation, but the corporation owes no debts, therefore A. owes nothing. The law has no toleration for such jugglery. It is a fraud both in fact and in law.[98]

That court also notes that "the exceptions to the general rule of successor non-liability exist to prevent the shareholders, officers, and directors of a corporation from eluding its debts and liabilities while maintaining control over its assets."[99]

Just as with the alter ego theory, the "fraud exception" to the successor liability theory is not

---

[96] *Id.  See also Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1132 n.4 (10th Cir. 1991); *Crutchfield v. Marine Power Engine Co.*, 209 P.3d 295, 300 (Okla. 2009).

[97]  *Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1132 (10th Cir. 1991).

[98] *Crutchfield v. Marine Power Engine Co.*, 209 P.3d 295, 300 (Okla. 2009) (*quoting Collinsville Nat. Bank v. Esau*, 176 P. 514 (Okla. 1918)).

[99] *Id.* at 300–01.

widely discussed in case law.  Some courts have applied the law of fraudulent conveyances in the context of the transfer of assets to a successor corporation.[100]  Whether "a transfer made or obligation incurred by a debtor is fraudulent as to a creditor" is an issue of state law, and is governed by the Uniform Fraudulent Transfer Act ("UFTA").[101]  Such a transfer is "fraudulent as to a creditor . . .if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor[.]"[102]  The UFTA provides a list of factors to be considered in determining whether actual fraudulent intent is present:

> 1. the transfer or obligation was to an insider;
>
> 2. the debtor retained possession or control of the property transferred after the transfer;
>
> 3. the transfer or obligation was disclosed or concealed;
>
> 4. before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> 5. the transfer was of substantially all the debtor's assets;
>
> 6. the debtor absconded;
>
> 7. the debtor removed or concealed assets;
>
> 8. the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
> 9. the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
> 10. the transfer occurred shortly before or shortly after a substantial debt was incurred; and

---

[100]  *See Grand Labs., Inc. v. Midcon Labs of Iowa*, 32 F.3d 1277, 1281 (8th Cir. 1994) ("Authorities suggest, however, that "the fraud exception to the nonliability of successors is merely an application of the law of fraudulent conveyances.") (*citing Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1426 (7th Cir. 1993)); *Burkholder v. Okmulgee Coal Co.*, 196 P. 679, 680–81 (Okla. 1921) (applying state law of fraudulent conveyance to "fraud in fact" prong of successor liability test).

[101]  24 O.S. § 116(A).

[102]  *Id.* § 116(A)(1).

11. the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[103]

The determination of whether fraudulent intent is present is a factual one done on a case-by-case basis.[104]  When a plaintiff establishes the presence of sufficient badges of fraud, he or she "is entitled to a presumption of fraudulent intent. Thereafter, the burden shifts to the transferee to show some legitimate supervening purpose for the transfers."[105]

The Court has little trouble finding that the transfer of the assets of FCI to RahnDee was made with the actual intent to hinder, delay, and defraud the IRS.  Although Losornio was not an insider of Reetz or Grubb, they maintained sufficient control over RahnDee and its assets to neutralize Losornio's involvement.  At the time of the transfer, Reetz and Grubb were well aware that the IRS was actively seeking to hold FCI liable for the Tax Debt.  This prompted the stripping of all of FCI's accounts and assets, leaving it a mere shell when the IRS finally got its paperwork in order.  Although no contemporaneous appraisal of FCI's assets was conducted, thus rendering it impossible to know the value of FCI's assets at the time of the transfer, RahnDee's books reported total equity of over $189,000 on the day the RCB Bank loan closed and the money changed hands.   The Court also finds that Reetz drafted the corporate documents in a way that would allow he and Grubb to reassert legal ownership of RahnDee once the dust cleared from the Beryllium/FCI trouble with the IRS.  This was a sham asset transfer designed to avoid FCI's payment of the Tax Debt.  The Court will not allow form

---

[103]  *Id.* § 116(B).

[104]  *See In re Lexington Oil and Gas Ltd., Co.,* 423 B.R 353, 372 (Bankr. E.D. Okla. 2010).

[105]  *Id*.

to prevail over substance.  The Court finds that the IRS has met its burden to show that RahnDee is liable as a successor in interest to Beryllium and FCI.[106]

### Conclusion

At this point in the Adversary Proceeding, the Court reaches two conclusions: (1) RahnDee is liable for the Tax Debt as the alter ego of and successor in interest to FCI and Beryllium; and (2) by the consent of the parties, the lien of RCB Bank on RahnDee's assets is superior to the lien on those assets claimed by the IRS.  Count One of this Adversary Proceeding is dismissed with prejudice.  All issues relating to the relative priority of the IRS and RCB Bank in Count Two of the Adversary Proceeding and the Answer and Counterclaim of RCB Bank are resolved.  The Court will schedule a status hearing in order to determine what issues remain for the Court's consideration.  At the conclusion of the status hearing, the Court will take such other and further action as it deems necessary.[107]

A Partial Judgment consistent with this Memorandum Opinion is entered concurrently herewith.

Dated this 18th day of September, 2015.

BY THE COURT:

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

6891.5

---

[106]  Because the Court finds that RahnDee is a successor in interest to Beryllium/FCI under the "fraud exception," it will not address the other exceptions discussed by the parties.

[107]  This Memorandum Opinion and the Partial Judgment entered concurrently herewith do **not** constitute a final order in this Adversary Proceeding.